# CIRCUIT COURT OF THE CITY OF NORFOLK

Azzure Denim, L.L.C.

 v.

E & J Lawrence Corp.
and S & D Men's, Inc.

    Case No. (Law) CL05-1238

RP55, Inc.

 v.

E & J Lawrence Corp.
and S & D Men's, Inc.

    Case No. (Law) CL05-1239

    February 9, 2006

BY JUDGE NORMAN A. THOMAS

 In these consolidated cases, the plaintiffs allege that the defendants breached their commercial contracts with them by failing to pay fully for purchased goods.

 On December 9, 2005, the Court conducted a hearing on the defendants' Motions to Dismiss for Lack of Personal Jurisdiction. With respect to those motions, the defendants made special appearances to object to this Court's

exercise of its personal jurisdiction over them. Notwithstanding the current procedural posture of the case, the Court understands that the parties have proceeded to engage in discovery and that the cases are set for trial commencing at 9:30 a.m. on Monday, July 24, 2006.

The issue is whether the defendants' business relationship with the plaintiffs involved sufficient contacts with Virginia to permit lawful exercise of personal jurisdiction over them pursuant to Va. Code § 8.01-328.1(A)(1). In resolving this issue, the Court considered the plaintiffs' motions for judgment, the content of the defendants' dismissal motions, the testimony, affidavits, and exhibits presented at the December 9, 2005, hearing, and counsel's oral and written arguments, including the authorities cited therein. The Court also conducted legal research on the issue.

When a defendant challenges a trial court's exercise of personal jurisdiction, the plaintiff bears the burden of establishing grounds for such exercise. In *Combs v. Baker*, 886 F.2d 673, 676 (4th Cir. 1989), the Court stated:

> When a court's personal jurisdiction is properly challenged . . .
> the jurisdictional question thus raised is one for the judge, with
> the burden on the plaintiff ultimately to prove the existence of a
> ground for jurisdiction by a preponderance of the evidence. . . .
> If the existence of jurisdiction turns on disputed factual
> questions, the court may resolve the challenge on the basis of a
> separate evidentiary hearing or may defer ruling pending receipt
> at trial of evidence relevant to the jurisdictional question.

Citations omitted. *See also, New Wellington Financial Corp. v. Flagship Resort Devel. Corp.*, 416 F.3rd 290, 294 (4th Cir. 2005); *Eastern Technical Enterprises, Inc. v. Wilson & Hayes, Inc.*, 46 Va. Cir. 558, 560 (Norfolk, 1997). *Cf., Glumina Bank v. D. C. Diamond Corp.*, 259 Va. 312, 317, 527 S.E.2d 775, 777 (2000); *Eure v. Morgan Jones & Co.*, 195 Va. 678, 680, 79 S.E.2d 862, 864 (1954).

In keeping with traditional evidentiary principles, this Court places greater weight upon live testimony made subject to cross-examination. However, as noted, in resolving the factual issues pertinent to the pending motions, the Court considered all informational sources that the parties presented.

The case of *International Shoe Co. v. Washington*, 326 U. S. 310 (1945), provides the modern bedrock standard for a state trial court's constitutional exercise of specific jurisdiction over a non-resident person or entity. In the course of its decision, the court examined the historical

underpinnings of *in personam* jurisdiction and announced the applicable due process standard:

> Due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Milliken v. Meyer*, 311 U.S. 457, 463.

*Id.*, at 316 (additional citations omitted).

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . it is clear that unlike an individual its "presence" without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it.

*Id.*, at 316 (citations omitted).

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. . . . But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to

> respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Id.* at 319 (citations omitted).

Va. Code § 8.01-328.1(A) provides that a court may exercise personal jurisdiction over a person or other entity acting directly or through an agent as to "a cause of action arising from the person's . . . (1) Transacting any business in this Commonwealth[.]" The plaintiffs rely upon this statutory provision in their effort to persuade the court to exercise *in personam* jurisdiction over the defendants.

Numerous Virginia cases hold that Va. Code § 8.01-328.1, often referred to as Virginia's "long-arm statute," enables trial courts to assert personal jurisdiction over individual and corporate non-residents to the fullest extent permissible under the Due Process Clause of the United States Constitution. *See, e.g. Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315, 319-20, 512 S.E.2d 560, 562-63 (1999); *Nan Ya Plastics Corp. v. DeSantis*, 237 Va. 255, 259, 377 S.E.2d 388, 391 (1989); *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.*, 218 Va. 533, 534-35, 238 S.E.2d 800, 802 (1977). The law constitutes a "single act" statute requiring but one transaction in Virginia to confer *in personam* jurisdiction over a non-resident defendant respecting a cause of action germane to that transaction. *Id.*; Va. Code § 8.01-328(1)(C); *and see discussion, Orchard Management Co. v. Soto*, 250 Va. 343, 350-51, 463 S.E.2d 839, 843 (1995).

The trial court must conduct a fact-specific inquiry into the jurisdictional issue so as to determine first whether the defendant's activities fall within one of the enumerated categories of Va. Code § 8.01-328.1(A)(1) through (10). If so, the Court then must determine whether such activities constitute sufficient "minimum contacts" with Virginia so that requiring the defendant to litigate in a Virginia court does not offend "traditional notions of fair play and substantial justice." *International Shoe*, 326 U. S. at 316, *quoting, Milliken v. Meyer*, 311 U.S. 457, 463 (1940). *And see, Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311, 313-14 (4th Cir. 1982). Because the statute's scope is co-extensive with constitutional due process, in reviewing trial court decisions, the Virginia Supreme Court typically does not bifurcate its analysis of the jurisdictional issue. *See, e.g., Peninsula Cruise,* 257 Va. 315 at 320-22, 512 S.E.2d at 563-64; *Nan Ya Plastics*, 237 Va. at 260-63, 377 S.E.2d at 391-93; *I.T. Sales, Inc. v. Dry*, 222 Va. 6, 8-9; 278 S.E.2d 789, 790-91 (1981); *John G. Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 740-41, 180 S.E.2d 664, 667-68 (1971); *Danville Plywood*, 218 Va. at 535, 238 S.E.2d at 802. In its more recent decisions, the court noted the "clearly discernable" trend "toward

expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents." *Nan Ya Plastics*, 237 Va. at 259-60, 377 S.E.2d at 391, *quoting*, *McGee v. International Life Ins. Co.*, 355 U.S. 220, 222 (1957); *and see also*, *Peninsula Cruise*, 257 Va. at 320, 512 S.E.2d at 563.

Turning to the cases at hand, at this juncture of the proceedings, the Court finds the following facts established by the greater weight of the evidence.

The plaintiffs, Azzure Denim, L.L.C. ("Azzure") and RP55, Inc. ("RP55"), both are Virginia corporations with their principal places of business in Virginia Beach. The primary business of each company is manufacturing and sale of clothing. Each company sells its apparel lines under various trade names primarily to retailers. George H. Metzger serves as president of both companies.

The defendants, E & J Lawrence Corporation ("E & J") and S & D Men's, Inc. ("S & D"), are New York corporations and share corporate offices in Brooklyn. Neither company owns property in Virginia, nor maintains an office or stations employees here. No Virginia registered agent exists for either corporation. Both companies' primary business consists of purchasing clothing from manufacturers such as the plaintiffs and selling or consigning it to independent, yet affiliated corporations which, in turn, sell the clothing retail to consumers at stores throughout the country.

In the five-year period preceding this litigation, E & J admits to having sold approximately $2,031,000 worth of goods to such retail outlets for sale in Virginia. S & D maintains that it sold no clothing intended for sale to retail customers in Virginia during the five years preceding this litigation. E & J admits purchasing $49,547.00 of clothing from Azzure and RP55 during 2004, and $9,459.00 of clothing from the plaintiffs during 2005 intended for retail sale in Virginia. S & D admits to no such purchases.

For the January 2004 through April 2005 time period, Azzure produced copies of invoices documenting sales to E & J in an amount totaling $211,720.85 and to S & D in an amount totaling $45,372.50. RP55 produced copies of invoices for same period totaling sales of $88,392.00 to E & J and $32,060.80 to S & D. Metzger personally observed clothing manufactured by Azzure for sale in a "Jimmy Jazz" retail clothing store located in Norfolk, Virginia. That, and other, Jimmy Jazz stores in Virginia and elsewhere are owned and operated by the some of the above-referenced independent corporations affiliated with the defendants.

Azzure and RP55 entered into verbal contractual relationships (hereinafter collectively referred to as the "contract") with E & J and S & D on or about October 29, 2003. Immediately prior to that date, Metzger and the General Merchandise Manager of E & J, Mitch Berson, had engaged in unsuccessful negotiations on behalf of the parties. Metzger and Berson

conversed by telephone, with Metzger in Virginia Beach and Berson in Brooklyn. By facsimile correspondence dated October 23, 2003, Berson sent Metzger a written communication relevant to those negotiations. The correspondence bore letterhead as follows: "E & J Lawrence, Jimmy Jazz/Hyperactive/S & D Stores, 43 Hall Street, Brooklyn, New York 11205, (718) 596-1414."[1] (December 9, 2005, hearing, Plaintiff's Exhibit 3). Prior to negotiating with Berson, Metzger had spoken by telephone from Virginia Beach with Robert Shapiro, an E & J employee in Brooklyn, who negotiated with Metzger on behalf of E & J and S & D. When their discussions faltered, Shapiro referred Berson to Metzger for further communications.

On October 29, 2003, Metzger, speaking from his Virginia Beach home, contacted Berson in his Brooklyn office. The two men conducted a final negotiation and reached verbal agreement between the parties. The agreement called for Azzure and RP55 to manufacture and ship clothing "FOB New York" to E & J and S & D. Azzure and RP55 would sell apparel to E & J and S & D and then invoice the defendants for the price of the shipped goods. However, the defendants' purchase price was subject to a "43% margin agreement." The margin agreement, *inter alia*, required the defendants to pay the plaintiffs' invoiced purchase price so long as the clothing sold at retail with a gross profit margin to the defendants of at least 43%. The margin agreement necessarily anticipated that the defendants would control the retail consumer price of the apparel sold to them by the plaintiffs. If the apparel sold at retail for a gross profit margin to the defendants of less than 43%, the defendants then would be entitled to a substantial discount from the plaintiffs on the invoiced purchase price of the shipped clothing. According to Metzger's unrebutted testimony, he and Berson agreed that the defendants would not permit retail sales of clothing shipped to defendants to fall below a 43% gross profit margin absent consultation with and permission from Metzger.

In these cases, the plaintiffs contend that the defendants, without any consultation with or permission from Metzger, permitted retail sales of Azzure and RP55 clothing lines at prices far below a 43% gross profit margin and now, in further breach of the parties' contract, refuse to pay the full invoiced price for

---

[1] Metzger testified at the December 9, 2005, hearing to the effect that those persons representing the defendants often blurred any distinction between E & J, S & D, and Jimmy Jazz. *See, e.g.*, December 9, 2005, transcript, pp. 26-36, 50-52, 55-56. The plaintiffs introduced several pages of exhibits at that hearing that corroborate the existence of strong affiliation between, shared employees of, and unity of commercial interests of E & J, S & D, and Jimmy Jazz. *See e.g.*, Plaintiffs Exhibits 2 through 5. As noted below in footnote 3 of this letter opinion, the parties= evidentiary presentations render the Court unable to meaningfully differentiate between E & J and S & D for purposes of resolving the jurisdictional issue raised in the dismissal motions.

substantial quantities of apparel.[2] Metzger testified that, in 2005, he received telephone calls "from Virginia stores complaining that [Jimmy Jazz stores] were selling our merchandise well below our suggested retail price and, basically well below our costs," (Clarification added.) He then went to the Jimmy Jazz store in Norfolk and observed Azzure clothing "selling in certain instances product $20 to $30 below suggested retail price, and I saw where they were selling product below our actual selling price to them." (December 9, 2005, hearing transcript, pp. 39-41). The plaintiffs contend that such sales evidenced the defendants' breach, in Virginia, of the parties' contract, and specifically the margin agreement provision. The defendants contend that market conditions necessitated any and all such mark-downs of retail clothing prices.

To analyze the jurisdictional issue pursuant to statutory and constitutional due process standards, the court necessarily takes a holistic view of the parties' relations. The defendants' representatives actively negotiated from New York with Metzger who, at all relevant times, spoke to them from his Virginia Beach office or home. The parties mutually sought and consummated their verbal contract on or about October 29, 2003, with Metzger's acceptance of the defendants' proposed terms. (December 9, 2005, hearing transcript, p. 33.) Thus, contract formation occurred in Virginia. Thereafter, defendants remitted payments for shipped goods and sent periodic reports and other correspondence to the plaintiffs in Virginia during 2004 and 2005, until such time as the parties' ceased doing business together as a result of their current dispute. The plaintiffs attribute to E & J conduct occurring in Norfolk, Virginia, allegedly evidencing its contract breach as to Azzure.

The Court finds that the defendants' individual and collective activities respecting their contractual relationships with the plaintiffs constituted "transacting business" within the ambit of Virginia Code § 8.01-328.1(A)(1). Moreover, such activities represent for each defendant sufficient minimum contacts with Virginia such that requiring them to litigate this action does not offend applicable due process standards.[3] A consistent line of Virginia precedent

---

[2] The plaintiffs commenced to ship clothing to the defendants pursuant to the contract in January 2004 and continued to do so until approximately April 2005.

[3] The Court notes an absence of tangible evidence that E & J committed conduct in Virginia evidencing breach of the margin agreement as to RP55, or evidence that S & D committed such conduct in Virginia as to either plaintiff. Nevertheless, the combined quality and nature of both defendants= conduct in negotiating contracts with Metzger and consummating them in Virginia, numerous aspects of routine contract performance, and the absence of discernable distinctions between E & J, S & D, and Jimmy Jazz in the defendants= relationship with the plaintiffs, compels the Court to reach an identical conclusion as to each defendant in its jurisdictional analysis.

supports this court's decision to exercise *in personam* jurisdiction over the defendants. *See, Peninsula Cruise, supra* (telephone communications with Virginia plaintiff, partial contract performance in Virginia); *Nan Ya Plastics, supra* (contract negotiations by telephone with Virginia plaintiff, written communications mailed to and contract formation in Virginia); *I.T. Sales, supra* (contract formation in Virginia, mailing of purchase orders to Virginia plaintiff); and *Chromodern Chair, supra* (procuring purchase order in Virginia for out-of-state manufacture and delivery of goods). *Cf., Glumina Bank, supra* (wherein a non-resident defendant's contractual obligation to remit to a Virginia plaintiff proceeds due from international transactions constituted "contracting to supply services or things in this Commonwealth" pursuant to Va. Code § 8.01-328.1(A)(2)).

For the reasons discussed above, the Court denies the dismissal motions of E & J and S & D. The Court notes the exceptions of the defendants to these rulings. By Order of this date, the Court directs that each defendant file responsive pleadings to the plaintiffs' Motions for Judgment within twenty-one calendar days.